Kathleen L. Wieneke, Bar #011139
Christina Retts, Bar #023798
WIENEKE LAW GROUP, PLC
1225 West Washington Street, Suite 313
Tempe, Arizona 85288
Telephone: (602) 715-1868
Fax: (602) 455-1109
Email: kwieneke@wienekelawgroup.com
Email: cretts@wienekelawgroup.com

*Attorneys for Defendants City of Phoenix, Benjamin Harris, Kyle Sue, and Jorge Acosta*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

Tyron McAlpin, an individual,

Plaintiff,

v.

City of Phoenix, a municipality; Benjamin Harris, an individual; Kyle Sue, an individual; and Jorge Acosta, an individual,

Defendants.

NO. 2:25-cv-00757-KML-JZB

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This case directly confronts the Supreme Court's pronouncement that an officer's use of force cannot be judged with "20/20 hindsight." On August 19, 2024, Officers were called to a Circle K to trespass a white male, D.S., who was behaving oddly and was the reported aggressor. (Doc. 1, at 3). The 911 call reported that another customer tried to intervene, but no description was provided and it was reported that the customer was outside and appeared to have left. When Officer Harris responded to the Circle K almost fifteen minutes later, he encountered D.S., removed him from the interior of the store, and D.S. reported that he had been hiding inside because someone assaulted him. D.S. had fresh blood on his shirt, an injury to his mouth, and he pointed across the street at Plaintiff and identified him as the purported assailant. Unbeknownst to officers, Plaintiff was not the assailant.

Officers Sue and Harris entered their patrol cars, followed Plaintiff intending to ask him questions, saw him looking at their patrol cars, and then taking action that appeared to

be an attempt to avoid them. Plaintiff had an Air-Pod in his ear and was holding his phone out in front of him because he was talking on it. Officer Harris pulled into the parking lot with his police truck in front of Plaintiff, but Plaintiff turned to avoid Harris' vehicle and kept walking (Doc. 1 at 4). Officer Harris gave a command for Plaintiff to stop. Plaintiff did not stop, Officer Harris exited his vehicle, and a struggle ensued. Officer Harris reasonably believed that Plaintiff was fighting him, threw a punch at him, and was resisting arrest. Officer Sue arrived and attempted to assist in the arrest and Plaintiff bit him on the hand. Officers would later learn that Plaintiff was deaf and had cerebral palsy, but this information was not reasonably apparent to them when they first encountered him. Plaintiff did not suffer any serious injury and, at most, suffered minor abrasions. The Defendants' use of force was reasonable under federal and state law, the doctrine of mistake of fact applies, the presumption of reasonableness applies to the state law claim, and the Defendants are entitled to qualified immunity on the federal claim.

Plaintiff also alleges a Fourth Amendment false-arrest claim against Harris, Sue, and Officer Acosta. (*See* Doc. 44, at 8). Plaintiff was criminally charged and, at the preliminary hearing while represented by counsel, the Court determined that there was probable cause to hold the Defendant to stand trial on Counts 1 (aggravated assault), 2 (resisting arrest), and 3 (aggravated assault). (DSOF99-102). Plaintiff attempted to challenge the preliminary hearing proceedings, and the Superior Court denied the request finding "Defense counsel was present at the hearing and had the opportunity to challenge the evidence." (DSOF113). Having fully participated in the criminal hearing, Plaintiff is precluded from claiming that there was not probable cause and that he was falsely arrested. Moreover, the body camera video establishes probable cause. Plaintiff's claim against Officer Acosta relates to a mistake Officer Acosta made relating to Plaintiff's possession of D.S.'s phone that D.S. claimed had been stolen. Officer Acosta did not submit charges for theft of the phone; the prosecution added this charge later. This misdemeanor charge did not affect whether Plaintiff was going to be charged and stand trial for the more serious felony charges of aggravated assault and resisting arrest. Qualified immunity also bars this claim.

# I. RELEVANT FACTS

## A. The Initial Call and Contact with D.S. at the Circle K

On August 19, 2024, Phoenix Police received a 911 call concerning a fight at the Circle K at 1122 East Indian School Road. (DSOF1). The call was received at 7:36:52 a.m. and dispatched at 7:40:18 a.m.; dispatch information described a white male in his twenties, wearing a gray shirt and blue shorts, as the aggressor and stated that he remained inside the store. (DSOF2). A CAD entry at 7:39:46 a.m. provided information that there was another customer that was involved, who was helping get the first male out of the store, but that he had gone outside and possibly left; the CAD did not provide any details about the second customer such as a physical description or clothing. (DSOF3).

Officers Benjamin Harris and Kyle Sue responded to the call at the Circle K, with Officer Harris first contacting the white male (D.S.); he did not speak with the Circle K employees. (DSOF4). When Officer Sue arrived, he saw Officer Harris speaking with D.S. outside the store. (DSOF5). Officer Sue briefly went into the store and spoke to the clerks who confirmed that they wanted D.S. trespassed. (DSOF6).

While outside the store, D.S. told Officer Harris that he had been assaulted and described the alleged assailant as a Black male wearing all black, including a black hoodie and dark pants or jeans. (DSOF7). D.S. also displayed blood on his shirt, appeared disheveled, seemed excited like he had been in a fight, and reported mouth or tooth-related pain; these observations led Officer Harris to credit D.S.'s account sufficiently to contact Plaintiff to further investigate. (DSOF8). D.S. pointed out Plaintiff, who was walking eastbound on Indian School Road; Officer Harris drove after Plaintiff with the intention of speaking with him. (DSOF9). D.S. had been assaulted at the Circle K earlier in the morning, but misidentified Plaintiff. (DSOF115-116).

At 7:54:37 a.m. through 7:55:21 a.m., Officer Harris advised over the radio that D.S. reported that he had been assaulted by a black male, he wanted prosecution, and put out a description of black male, black shorts, black hat on backward. (DSOF10). At the time of D.S.'s identification of Plaintiff, 14 minutes and 34 seconds had elapsed between the time

that Circle K reported that the "other customer" (later discovered to be Plaintiff) had left the store and D.S.'s identification of Plaintiff as the alleged assailant. (DSOF11).

**B. Expert William Neale- Video Synchronization and Analysis**

Defense expert William Neale performed a video analysis and synchronized three separate video files: Officer Harris' body camera, Dollar Tree Security, and video-within-video Dollar Tree Security. (DSOF12). The total time of the incident analyzed was one minute and forty-two seconds. (DSOF13). Expert Neale conducted a frame-by-frame analysis adding highlighted circles to actions at issue, specifically biting and closed fist strikes. (DSOF14).

**C. Contact with Plaintiff in the Dollar Tree Parking Lot**

As they drove after Plaintiff, Officers Sue and Harris were driving separately in marked police vehicles with large police insignias on the sides, front, and back. (DSOF15). Officer Harris believed that Plaintiff was avoiding police contact as he "made eye contact with me a couple of times and the changes in direction immediately following those eye contact settings communicated to me that he didn't want to be contacted by police." (DSOF16). As Officer Harris pulled into the Dollar Tree near Plaintiff, he gave a command: "Hey buddy, stop where you are at." (DSOF17). Plaintiff was walking in the direction immediately towards Officer Harris' patrol vehicle and then abruptly changed direction without stopping. (DSOF18). Officer Harris reasonably believed that Plaintiff disregarded his command presence—marked police vehicle, changing directions, commands—and Officer Harris believed that he was going to flee. (DSOF19).

Officer Harris exited his vehicle and Plaintiff looked straight at him. (DSOF20). Officer Harris reached out to take ahold of Plaintiff's left arm as Plaintiff was backing away from him and he began to resist; Officer Harris gave a command: "have a seat." (DSOF21). Plaintiff swung his arm toward Officer Harris, which Officer Harris reasonably perceived as a punch toward his head that he blocked. (DSOF22). Plaintiff then moved his left hand up in a motion that reasonably appeared to Officer Harris to be an attempted strike. (DSOF23).

As Plaintiff continued to move his arms around, his right hand clutched his phone in a fist-like posture that Officer Harris reasonably perceived to be initiating a strike. (DSOF24). Plaintiff's left hand came toward Officer Harris and Officer Harris reacted by grabbing it. (DSOF25). After the first swing by Plaintiff, Officer Harris believed that he "now had reason to arrest him for aggravated assault" and was engaging him to "eventually get him into handcuffs." (DSOF26). After Plaintiff continued to throw his arms around, Officer Harris delivered a strike that made contact on Plaintiff's back and then grazed past the back of his head. (DSOF27). Plaintiff then drove his left arm into Officer Harris' shoulder. (DSOF28). Plaintiff backed away, with Officer Harris' arm appearing to initially be trapped between Plaintiff's arms and his head. (DSOF29). Officer Harris perceived that Plaintiff was squaring his body toward Officer Harris in a fighting stance. (DSOF30). Officer Harris reached out and grabbed Plaintiff's right arm and attempted a strike toward Plaintiff's back which missed. (DSOF31).

Officer Sue arrived as the physical encounter was underway and as he was going to pull into park he "observed the Defendant actively swing at Officer Harris…I saw a right hand go across." (DSOF32). Officer Sue believed he observed an aggravated assault perpetrated on Officer Harris and intended to take Plaintiff into custody for that crime. (DSOF33). As he ran up, Officer Sue also saw that Plaintiff was in a position with his feet in a wide stance, with his hands up, which based upon his training and experience is a stance where a suspect is about to throw punches. (DSOF34).

Officer Harris struggled with Plaintiff from behind as Officer Sue joined and began physically grappling with Plaintiff by hooking his right hand around the back of Plaintiff's head to attempt to force him to the ground; Plaintiff went to the ground on his butt. (DSOF35). Plaintiff rolled partially on his right side and wrapped his legs around Officer Harris' leg. (DSOF36). Plaintiff made a biting motion toward Officer Harris' hand as his legs were wrapped around Officer Harris' leg. (DSOF37). Officers Harris and Sue struggled with Plaintiff as they were on the ground, but their torsos were in semi-upright positions; Plaintiff's legs were still wrapped around Officer Harris. (DSOF38). Neither officer had

control of Plaintiff's arms, Officer Harris' leg was still trapped within Plaintiff's legs, and Officer Sue delivered two strikes toward Plaintiff's back. (DSOF39).

Plaintiff was given three repeated commands to put his hand behind his back during this time frame, with the last: "hands behind your back now sir." (DSOF40). During this same time frame, Officer Sue deployed one strike towards the direction of Plaintiff's side. (DSOF41). Officer Sue then delivered a fourth strike toward Plaintiff's head that landed on the back/side of his head in a grazing-type motion. (DSOF42). Officer Sue delivered strikes because Plaintiff had already assaulted Officer Harris, was given commands to put his hands behind his back and was non-compliant. (DSOF43).

Officer Harris, with his leg still trapped between Plaintiff's legs and now lying on his right side (with his right leg pinned) deployed three strikes. (DSOF44). One strike landed in the Plaintiff's hairline, on the right side but toward the back of Plaintiff's head and grazed forward. (DSOF45). The second strike landed in the same area; Officer Harris was still lying on his side with Plaintiff's legs wrapped around his. (DSOF46). The third strike was delivered from this same side lying position, with Officer Harris' leg still trapped, and to the same location on the Plaintiff. (DSOF47).

Officer Sue then delivered a fifth strike towards the back of the Plaintiff's head, which landed in a grazing motion, as the struggle continued and neither officer had control of the Plaintiff's hands. (DSOF48). Officer Harris reached his hand toward the back of Plaintiff's head and Officer Sue simultaneously attempted a strike which appears to strike Officer Harris' hand. (DSOF49). As Officer Harris was using his right hand on the ground and pulling on his trapped leg, Officer Sue attempted another strike that again appears to hit Officer Harris' hand that is on the back of Plaintiff's head; Plaintiff's hands are not controlled by either officer. (DSOF50).

As Officer Harris was still attempting to get up off the ground and his leg was still entangled, Officer Harris deployed a fifth strike that landed on the right side of the Plaintiff's head, in his hairline above his ear. (DSOF51). With his leg still trapped, Officer Harris utilized a sixth strike, which landed near the top of the Plaintiff's forehead.

(DSOF52). Officer Harris continued to try to pry his leg free, eventually succeeding (DSOF53).

Officer Harris reached down to try to grab Plaintiff's right arm with his left hand but could not do so as his hand was broken. (DSOF54). Plaintiff was on his side as Officer Harris retrieved his Taser. (DSOF55). Officer Sue testified that Plaintiff bit him while he held onto Plaintiff, causing Officer Sue to deliver three strikes toward the back of Plaintiff's head near his ear. (DSOF56). Officer Harris directed Officer Sue to move so that he could deploy the Taser in probe mode, using two separate sets of probes for a five-second cycle. (DSOF57). Officer Harris gave commands for Plaintiff to put his hands behind his back and advised over the radio that the Taser had been deployed and requested more units. (DSOF58). Officer Sue moved to handcuff the Plaintiff holding on to his left arm while Plaintiff's right hand was pinned under his body. (DSOF59). Officer Sue deployed a strike to Plaintiff's back to attempt to free Plaintiff's right arm. (DSOF60).

Officer Harris then pulled the trigger to activate a second five-second Taser cycle, while Plaintiff's right hand was still underneath his body. (DSOF61). After the Taser cycle completed, Officer Harris yelled another loud command of "hand behind your back," as Plaintiff's right hand was still pinned under his body. (DSOF62). When Plaintiff did not move or unpin his hand, Officer Harris pulled the trigger to activate a third five-second Taser cycle while yelling "hand behind your back" twice. (DSOF63). Plaintiff's hand remained pinned. Officer Harris could not use his broken hand, so he delivered a quick foot strike toward Plaintiff's arm. (DSOF64). Officer Sue deployed a fist strike toward the back of Plaintiff's head. (DSOF65). Officer Harris deployed the Taser for a fourth cycle and Officer Sue was able to place Plaintiff hands behind his back and put cuffs on. (DSOF66). Officer Harris then asked to roll fire, reported that the Taser had been deployed, reported that he thought he broke his hand (which he did), and Officer Sue answered affirmatively that Plaintiff bit him. (DSOF67).

### D. Officer Acosta's Investigation and the Misidentified Cell Phone

Officer Acosta arrived after the force encounter had concluded; when he reached the Dollar Tree parking lot, Plaintiff was on the ground, handcuffed, and lying on his side. (DSOF68). Acosta observed bleeding from Officer Sue's hand that Sue described as a bite, again requested Phoenix Fire, and began removing property from Plaintiff's pockets. (DSOF69). After the encounter, he reviewed Dollar Tree surveillance video, captured that review on his body-worn camera, and took photographs of D.S and the officers. (DSOF70). Officer Acosta volunteered to prepare the original report, arrest paperwork, and booking materials concerning Plaintiff. (DSOF71).

D.S. was brought to the location of Plaintiff's arrest for a one-on-one identification. (DSOF72). Officer Acosta took photographs of D.S., then left to view video inside the Dollar Tree while Officer Abeyta finished talking to D.S. (DSOF73). D.S. reported to Officer Abeyta that his phone had been taken in the assault and asked for its return. (DSOF74). D.S. asked Officer Abeyta if he could check for his missing phone. (DSOF75). Officer Abeyta told D.S. he would check but believed that Plaintiff only had a belt. (DSOF76). While watching video inside the Dollar Tree, Officer Acosta responded to Officer Abeyta's radio inquiry about the phone by stating: "we didn't find any Iphones on him or phones at all." (DSOF77). He responded further: "we can ask the 101, see if he gave it to her…the only prisoner property I have is headphones and a black belt that is the only prisoner property he had on him." (DSOF78). Then after seeing a phone in Plaintiff's hand on the Dollar Tree footage, Officer Acosta stated: "let me check in with Kyle to see where that phone went." (DSOF79). Officer Acosta later found a black phone in a black case that generally matched D.S.'s description of his phone, which had been picked up off the ground near Plaintiff. (DSOF80).

As this investigation was unfolding, the officers' attention was drawn to an active kidnapping in progress; they left the scene to respond to the kidnapping. (DSOF81). Officer Acosta did not submit charges related to the phone, only related to the aggravated assault and resisting arrest. (DSOF82). Officer Acosta simultaneously prepared the booking report

and Form IV for Plaintiff, which was done before his incident report was final. (DSOF83). The Form IV submitted for charging did not recommend any charges for theft of a phone. (DSOF84). Officer Harris did not author the Form IV and did not know who had authored it. (DSOF85). Neither Officer Harris nor Officer Sue reviewed Officer Acosta's report before he submitted it. (DSOF86). Officer Sue never heard any information regarding an allegation that D.S. phone was stolen and had nothing to do with this part of the investigation. (DSOF87). Officers Sue and Harris went to the hospital (for the bite and broken hand) after Plaintiff was handcuffed and the other officers arrived. (DSOF88). There is information in the Form IV related to the phone, which Officer Acosta forgot to remove when he submitted it, as he knew at the precinct that it was not D.S.'s phone; Officer Acosta attributes his mistake to the interruption of the investigation by the kidnapping. (DSOF89). The Maricopa County Attorney's Office later added a charge for theft without contacting Officer Acosta for clarification or an update. (DSOF90).

### E. Information Relating to Plaintiff and His Hearing and Physical Impairments

Jessica Ulaszek, Plaintiff's girlfriend at the time of the incident, testified that she was communicating with Plaintiff by FaceTime as he walked from the Circle K toward Dollar Tree, but could not see what occurred through the FaceTime connection. (DSOF91). Plaintiff told her that he had been in the Circle K, D.S. was trying to fight him, and that the police were following him. (DSOF92). She came to the scene and first saw him on the ground and in handcuffs. (DSOF93). An officer came to interview Ms. Ulaszek, but the interview was interrupted by a kidnapping that was going on across the street with a girl "hanging out of the truck," and "Everybody. Everybody. All those officers left. Everybody left." (DSOF94). Plaintiff did not have hearing aids during the period Ms. Ulaszek had known him and primarily communicates through lip reading, FaceTime, and text messages. (DSOF95). To the extent Plaintiff argues he is incapable of physical resistance, after this incident, Ms. Ulaszek filed a petition for an order of protection against Plaintiff, which

documents prior and subsequent incidents of physical aggression, including biting and physical fights. (DSOF96-98).

### F. Preliminary Hearing- Criminal Charges for Aggravated Assault and Resisting Arrest- Probable Cause Found

A Superior Court judge held a preliminary hearing on October 1, 2024, at which the following evidence was admitted: (1) Officer Sue's testimony subject to cross-examination; (2) Officer Harris' testimony subject to cross-examination; (3) portions of the body camera of Officer Harris; (4) portions of the video surveillance from the Dollar Tree; and (5) screen shots from the video footage. (DSOF99). On September 30, 2024, the State moved to dismiss the phone theft count, which was granted before the preliminary hearing. (DSOF100). The Court also heard closing arguments. (DSOF101). The Court found probable cause to hold Plaintiff to stand trial on Counts 1, 2, and 3. (DSOF102).

During the preliminary hearing, Officer Harris testified that: (1) he took hold of Plaintiff's left arm after interpreting his movement as an effort to flee; (2) Plaintiff then pulled the arm away and swung a closed left fist toward Harris's head; (3) Harris blocked the punch, which contacted his arm rather than his head. (DSOF103). Officer Sue testified that he was following Harris into the Dollar Tree parking lot, parked north of Harris, and observed Plaintiff swing his right hand at Harris before he exited his Tahoe and ran to assist. (DSOF104). Both Harris and Sue testified that, after Plaintiff was taken to the ground, he kept his arms beneath his torso or body, preventing the officers from obtaining his arms to apply handcuffs. (DSOF105). Officer Sue testified regarding the strikes he delivered both before and after the bite sustained to his hand. (DSOF106). At the preliminary hearing, Sue acknowledged that he did not see Plaintiff's mouth at the time of the reported bite; he testified that he felt pain on his wrist like a bite. (DSOF107). Plaintiff's counsel tried to advance the theory that Officer Sue used a chokehold, which he denied, and that Plaintiff bit him due to the alleged chokehold. (DSOF108). The overhead video from the pole camera was not played during the preliminary hearing and that video, when viewed in conjunction with the others, does not show a time when an alleged "chokehold" could have

been applied due to the upright torso positions of the officers. (DSOF109). Harris testified that he deployed his Taser as Plaintiff remained on the ground with his arms underneath him and that the officers' strikes and Taser use stopped once Plaintiff provided his arms for handcuffing. (DSOF110). Sue testified that he learned after the encounter that Plaintiff was deaf and had cerebral palsy. (DSOF111). Harris likewise testified that he had not observed any indication before or during the encounter that Plaintiff could not hear his commands. (DSOF112).

Following the preliminary hearing, Plaintiff moved to extend the time to challenge the preliminary hearing, which was rejected with the judge ruling: "THE COURT FINDS the Defendant presents no authority to support their right to challenge a preliminary hearing. Defense counsel was present at the hearing and had the opportunity to challenge the evidence. No good cause appearing, IT IS ORDERED denying the motion." (DSOF113). On October 30, 2024, the State moved to dismiss the case "without prejudice," which was granted. (DSOF114).

## II. LEGAL STANDARD

Under Fed. R. Civ. P. 56(a), the court must determine whether there is a genuine issue of material fact, and that the movant is entitled to judgment as a matter of law. In making this determination, the court resolves all inferences and views all facts in the light most favorable to the non-moving party. *Nehad v* Browder, 929 F.3d 1126, 1132 (9th Cir. 2019). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380-81 (2007) *Scott*, 550 U.S. at 380-81. Although the facts and inferences are drawn in favor of the non-moving party "*to the extent supportable by the record*," the reasonableness of the officers' actions "is a pure question of law." *Harris*, 550 U.S. at 381 n.8 (emphasis in original).

Once "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."

*See Ames v. City of Tempe*, 665 F. Supp. 3d 1013, 1017 (D. Ariz. March 28, 2023) (where officer claimed that plaintiff attempted to grab his gun, but the video did not corroborate or contradict the testimony, the officer's testimony did not need to be disregarded); *Baker v. Tevault*, 2022 U.S. Dist. LEXIS 186650, 2022 WL 7033701 at *3 n. 5 (D. Ariz. 2022) ("The mere fact that not every action is observable or clear from the video evidence is insufficient to create a genuine issue of material fact regarding Tevault's first-hand sworn testimony about what occurred.").

## III. ARGUMENT

### A. The Force Used by Harris and Sue Was Objectively Reasonable as a Matter of Law[1]

The Fourth Amendment standard is one of objective reasonableness, requires use of force to "be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and must take into account that officers "are often forced to make split-second judgments…about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396 (1989). In analyzing the reasonableness of force, courts should give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham* 490 U.S. at 388; *Harris*, 550 U.S. at 381. Ultimately, the most important of the *Graham* factors is "whether the suspect posed an 'immediate threat to the safety of the officers or others.'" *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011), quoting *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc).

The Fourth Amendment does not require omniscience or absolute certainty about the degree of danger before officers may act. *Wilkinson v. Torres*, 610 F.3d 546, 551. The officer's perspective controls even when the officer's perception turns out to be wrong:

[1] The Complaint includes all Defendants in this claim, however, prior to filing this Motion for Summary Judgment. Plaintiff's counsel confirmed that Acosta was not included as he arrived after the force was used.

"'Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of' an immediate threat, and 'in those situations courts will not hold that they have violated the Constitution.'" *Estate of Strickland v. Nevada County.*, 69 F.4th 614, 621 (9th Cir. 2023). In determining whether the force was objectively reasonable, the Ninth Circuit has instructed that officers "need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

***1. Severity of the Crimes***

Police may detain individuals within a suspected crime scene and ask for their identification. *Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt Cnty.*, 542 U.S. 177, 185 (2004); *see Terry v. Ohio*, 392 U.S. 1, 19, n. 16 (1968). Even when officers have no basis for suspecting a particular individual, they may generally ask the individual questions, including asking to examine identification. *Florida v. Royer*, 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983); *Immigration & Naturalization Serv. v. Delgado*, 466 U.S. 210m 80 L. Ed. 2d 247 (1984) (noting that interrogation relating to one's identity or a request for identification by the police, by itself, does not constitute a Fourth Amendment seizure). A police officer may seize a person for a brief investigatory stop if the officer has reason to believe that the person has broken the law. *Terry v. Ohio*, 392 U.S. 1 (1968). This includes the ability to place them into handcuffs. *Graham*, 490 U.S. at 396 ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."). In an investigatory stop, if the suspect poses a threat or attempts to leave before the investigatory stop has run its course, handcuffing is appropriate. *Ames*, 665 F. Supp. 3d at 1036*; see also United States v. Haye*, 825 F.2d 32, 35 (4th Cir. 1987) ("By its very nature, . . . a *Terry* stop is involuntary, and the suspect is not free to avoid it by flight. To that extent, his freedom is limited, and the policeman is authorized to use such reasonable force as may be necessary to accomplish the purpose of the limited stop.").

Here, Officers developed reasonable suspicion based upon the first-hand information provided by D.S., who claimed he had been assaulted, had blood on his clothing and an injury to his mouth, and pointed out Plaintiff in the officers' presence. Officer Harris did not pick Plaintiff as the potential suspect at random and voiced that he simply intended to initially make contact and obtain his side of the story. *See Ramirez v. City of Buena Park*, 560 F.3d 1012 (9th Cir. 2009) (officer had reasonable suspicion who approached plaintiff, reclining in his parked car, who appeared to be sleeping and gave a testy response indicating the potential of stimulant use, and was subsequently ordered out of the car). There was no information or description given to the officers about Plaintiff. All they knew is that some customer also interacted with D.S. and had left the store almost fifteen minutes before D.S. identified Plaintiff. (DSOF3, 10-11).

As the officers approached Plaintiff, he engaged in behavior that was suspicious to them—tracking their movements and walking to attempt to avoid them. (DSOF15-20); *See Illinois v. Wardlow*, 528 U.S. 119, 124-5 (2000) ("[N]ervous, evasive behavior, is a pertinent factor in determining reasonable suspicion."). When Officer Harris pulled into the Dollar Tree in a fully marked patrol vehicle and yelled for Plaintiff to stop, Plaintiff also appeared to intentionally avoid him. *Tatum v. City & Cty. of S.F.*, 441 F.3d 1090, 1094-95 (9th Cir. 2006) (noting that a detainee mumbling, disobeying commands and perspiring heavily created "a fair probability he had committed a crime."). This information led officers to reasonably believe, albeit mistakenly as to the assault against D.S., that criminal activity was afoot.

When Officer Harris reached out to grab Plaintiff's wrist, a reasonable officer would have perceived that Plaintiff was non-compliant, swung at him, and then raised his arms up as if he was going to swing. (DSOF21-28). *See Harrod v. Lee*, 2024 U.S. App. LEXIS 31742 (6th Cir. Dec. 13, 2024) (addressing *Terry* stop of an individual that may have been involved in a domestic dispute, who brushed past officers, did not obey commands and the investigation was not completed, and recognizing that the officer could have reasonably believed that stopping him would prevent violence). A reasonable officer would have

believed there was probable cause to support an arrest for aggravated assault and resisting arrest. (DSOF30-34); *Glass v. Robinson,* 2022 U.S. Dist. LEXIS 15136, 2022 WL 252395, *4 (D. Ariz. 2022) (concluding that the officer "grabbing [the plaintiff's] arm to put her into handcuffs was not an unreasonable method to prevent a suspect from leaving during a Terry stop" where "[t]he body-cam video establishes that Glass was drunk and attempting to escape the police officers."). Thereafter, Plaintiff wrapped his leg around Officer Harris' leg (aggravated assault), and he bit Officer Sue (an aggravated assault) (DSOF21-56). *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (officer does not violate any clearly established right "when he progressively increases his use of force from verbal commands to an arm grab, and then a leg sweep maneuver, when a misdemeanant refuses to comply with the officer's orders…in a challenging environment"). This factor favors the Defendants.

***2. Threat to Officers and Others***

The immediate threat to safety posed by this incident includes: (1) the allegation by D.S. that there was an assault; (2) visual indicators that Plaintiff was intentionally attempting to avoid officers; (3) Plaintiff's actions in backpedaling and raising his arm when Officer Harris attempted to contact him and reach for his arm to complete the detention; (4) an objectively reasonable belief that Plaintiff was swinging and attempting to strike Officer Harris; (5) Plaintiff's physical strength in resisting both officers; (6) Plaintiff's act of wrapping his leg around Officer Harris and then biting Officer Sue; and (7) that Plaintiff's arm remained underneath him as the officers attempted handcuffing. *Ryburn v. Huff*, 132 S. Ct. 987, 991-92 (2012) (per curiam) ("judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation."); *A.B. v. Cty. of San Diego*, 2020 U.S. Dist. LEXIS 182507 (S.D. Cal. 2020) (where deputy first attempted to verbally communicate, the suspect was non-compliant, and once the officer attempted to hold the suspect's hands and wrists together and he pulled them away, it was reasonable to believe that the suspect posed a threat to himself, to the

officer, and possibly anyone who encountered him). The act of biting an officer is a serious threat to officer safety. This factor weights in favor of the Defendants.

### ***3. Actively Resisting Arrest and Attempt to Flee***

The third *Graham* factor—whether the suspect was actively resisting arrest or attempting to flee—also weighs in Defendants' favor. As noted in *Liberti v. City of Scottsdale*, where the suspect refused to comply with multiple commands and the officer merely escalated from verbal commands to empty-hand coercion: "once Liberti began struggling against [the officer's] empty-hand coercion, he was resisting arrest and posed an immediate threat to the officer's safety. Thus, no reasonable jury could find that [the officer's] use of force in grabbing and later attempting to restrain Liberti was objectively unreasonable." 2018 U.S. Dist. LEXIS 154600, *11-12 (D. Ariz. 2018); *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) (holding that officers did not use excessive force in using physical force sufficient to lift an unarmed suspect from the ground after the suspect resisted being handcuffed by stiffening her arm and attempting to "pull free").

Here, as the video demonstrates, Officer Harris first attempted— through command presence and verbal persuasion— to merely contact the Plaintiff to further investigate D.S.'s allegations. (DSOF15-21). Plaintiff did not stop and appeared, to a reasonable police officer, to be intentionally avoiding contact. *Mattos v. Agarano*, 661 F.3d 433,444 (9th Cir. 2011) (suspect who "refused to get out of her car when requested to do so and later stiffened her body and clutched her steering wheel to frustrate the officers' efforts to remove her from her car" had "engaged in some resistance to arrest."). Officer Harris reasonably perceived active aggression as Plaintiff appeared to take swings toward him. (DSOF22-67); *Gay v. City of E. Moline*, 2014 U.S. Dist. LEXIS 87566, at *8, 29 (C.D. Ill. June 27, 2014) (holding that takedown was not excessive force when plaintiff stepped away from the officer and refused to get on the ground when the officer grabbed hold of him). The physical grappling, limited strikes that did not cause injury, and Taser deployment after the bite, were necessary to overcome the resistance. *Luchtel v. Hagemann*, 623 F.3rd 975, 981 (9th Cir. 2010)

("Because [plaintiff]…was actively resisting arrest, there is no genuine dispute on this issue, and [her] aggressive and resistant behavior weighs in favor of a finding that the officers' use of force was justified."); *Tuttelman v. City of San Jose*, 420 Fed.Appx. 758, 763 (9th Cir. 2011) ("[Officer] Luisi grasped Tuttelman's right wrist, in anticipation of the attempted pat-down search, only after Tuttelman had refused to comply with Officer Luisi's instructions to put his hands above his head and, instead, kept his hands down at this sides and clenched his fists. This sort of *de minimis* use of force cannot ground an *excessive* force claim under the Fourth Amendment."). This factor favors Defendants.

***4. Nature and Quantum of the Force***

"The nature and degree of physical contact are relevant to this analysis, as are the 'risk of harm and the actual harm experienced.'" *Williamson v. City of Nat'l City*, 23 F.4th 1146, 1151-52 (9th Cir. 2022); *See Nelson v City of Davis*, 685 F.3d 867, 879 (9th Cir. 2012) ("The actual harm caused to [a plaintiff] is certainly relevant in evaluating the degree of the Fourth Amendment intrusion."). The absence of significant injuries is pertinent to Plaintiff's claims of excessive force and—like other factors—weighs in favor of the officers. *Saucier*, 533 U.S. at 209 (pointing out that protester did not claim any injuries from being "violently" shoved into the van). Lack of injury establishes that the Fourth Amendment intrusion was relatively minor. *See Graham,* 490 U.S. at 396; *Shaffer v. Maddox*, 2016 U.S. Dist. LEXIS 98948 (S.D. Ga. 2016) (in analyzing force used to pull a resisting and non-compliant suspect from a railing, noting that scratches, bruises, soreness, and back pain, were evidence of a minimal injury supporting the conclusion that the force was not excessive); *Nolin v. Isbell*, 207 F.3d 1253, 1257, 1258 n. 4 (11th Cir. 2000) (shove, knee in the back and "uncomfortable" groin search resulting in minor bruise was *de minimus*); *Josfan v. Indochine*, 2012 U.S. Dist. LEXIS 4688, 2012 WL 113371, at *9 (C.D. Cal. Jan.13, 2012) (officers who grabbed obstreperous nightclub customer without warning, forced him to the ground, and handcuffed him caused a "limited and slight" intrusion on his Fourth Amendment rights); *Durruthy v. Pastor*, 351 F.3d 1080, 1085, 1094 (11th Cir. 2003) (forcing cameraman filming arrest to the ground while arresting him for being on the street

rather than sidewalk constituted “de minimis force” and was not excessive under the Fourth Amendment).

Here, Plaintiff suffered no serious physical injury from the force utilized. At most, he had minor abrasions from the ground struggle.

i. <u>Fist Strikes</u>

Both Officer Sue and Harris deployed fist strikes, intermediate force, which caused no injury. In analyzing the strikes, what position the officers were in when the strikes were deployed (physics/leverage) and where they landed is relevant to the Court’s inquiry. See *Neal v. Bierbaum*, 2018 U.S. Dist. LEXIS 202777, 2018 WL 6268198 (C.D. Ill. Nov. 30, 2018) (analyzing the nature of the specific strike at issue, a closed fist to the mouth, and determining it was above de minimis force but on the lower end of the “non-lethal spectrum.”). Body strikes are a lower degree of physical force than strikes that landed on the side or back of the Plaintiff’s head.

Officer Harris deployed seven total strikes, one of which missed. The first strike contacted Plaintiff’s back and grazed past the back of his head. (DSOF27). The second strike, directed toward Plaintiff’s back, missed. (DSOF31). The third, fourth and fifth strikes were delivered while Officer Harris was laying on his right side with his leg pinned and landed on the right side toward the back of the Plaintiff’s head. (DSOF45-47). Officer Harris deployed a sixth strike that landed in the Plaintiff’s hairline on the right side of his head above his ear, as Officer Harris was trying free his leg. (DSOF51). His seventh strike occurred during similar circumstances and landed on the top of Plaintiff’s forehead. (DSOF52). Given the body positioning of Officer Harris and Plaintiff, none of the strikes were delivered while standing or squarely with full force at the Plaintiff. Nor did any hit him in the eyes, nose, or mouth. Instead, the strikes that landed occurred while Officer Harris was side-lying and using his dominant and non-dominant hand.

Officer Sue deployed a total of twelve strikes. Officer Sue delivered two strikes to Plaintiff’s back as the officers struggled on the ground. (DSOF39). Officer Sue’s third strike was directed towards Plaintiff’s side. (DSOF41). His fourth strike landed on the

back/side of Plaintiff's head in a grazing-type motion. (DSOF42). The fifth strike toward the back of Plaintiff's head, which landed in a grazing motion. (DSOF48). Officer Sue delivered his sixth and seventh strike toward the back of Plaintiff's head, but they hit Officer Harris's hand on top of Plaintiff's head. (DSOF49-50). Officer Sue delivered his eighth, ninth, and tenth strikes to Plaintiff's head after being bit by Plaintiff. (DSOF56); *See Pashova v. Geist,* No. 09-cv-340 JD, 2012 U.S. Dist. LEXIS 43760 at *33 (N.D. Ind. Mar. 29, 2012) (taser use was not excessive on restrained suspect who was spitting and attempting to bite; "the Officers would have perceived the threat posed by accidental ingestion of or exposure to her saliva as a significant one, given their concerns that she was a drug user"; the suspect "was also indisputably disruptive, uncooperative, and unresponsive"); *Stormer v. Koon*, No. 08-CV-813, 2010 U.S. Dist. LEXIS 31075 at *19 (S.D. Ohio Mar. 30, 2010) (the defendants' use of knee strikes and fist strikes were not excessive under the Fourteenth Amendment even though the plaintiff was handcuffed and lying down in cell when the plaintiff kicked at defendants and spit blood at them). Officer Sue delivered the eleventh strike to Plaintiff's back to attempt to free his right arm. (DSOF60). The twelfth strike was delivered toward the back of Plaintiff's head. (DSOF65). None of Officer Sue's strikes was delivered squarely, or while Officer Sue was even standing, nor did they hit Plaintiff in the eyes, nose, or mouth.

ii. Four Taser Applications on the Ground.

The Ninth Circuit has held that the use of a Taser is reasonable where the suspect "was also actively resisting arrest," and "the officers could reasonably believe that they were themselves in danger." *Marquez v. City of Phoenix*, 693 F.3d 1167, 1175 (9th Cir. 2012), *as amended on denial of reh'g* (Oct. 4, 2012). In *Marquez*, the Ninth Circuit held that although the Taser download showed 22 trigger pulls for total of 123 seconds of activation, the physical evidence only confirmed nine X26 Taser applications to an unarmed suspect, which when utilized on actively resisting and kicking suspect was found to be objectively reasonable. *Id.; see also Beaver v. City of Fed. Way*, 301 F. App'x 704, 705 (9th Cir. Oct. 23, 2008) (Taser use objectively reasonable because plaintiff was suspected of

committing a daytime burglary, a felony in Washington, and attempted to flee from the officer, ignored a warning to stop, and remained non-compliant to the officers' commands).

Plaintiff was on the ground when the Taser was deployed, which mitigated any danger from falling and potential associated injury. Courts, when evaluating Taser deployments and placing them within the spectrum of "intermediate force," regularly do so based upon the fact that a Taser deployment can cause serious injury because of the resulting fall. *C.f. Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. Nov. 30, 2010) (evaluating Taser deployment where the plaintiff fell forward and fractured four teeth, the court stated that "tasering a person may result in serious injuries when intense pain and loss of muscle control cause a sudden and uncontrolled fall"). Those concerns are wholly absent here and the Taser deployments should be evaluated based on pain compliance and falling on the lower end of intermediate force.

iii. Officer Harris' Single Foot Strike

Officer Harris delivered a single foot strike to Plaintiff's right arm after it remained pinned under his body in an attempt to free it. This kick was not directed to Plaintiff's head, or neck, but toward the hand that Officer Harris could not handcuff due to his broken hand. Plaintiff suffered no injury from this kick either. *See Goodrich v. Everett*, 193 Fed. Appx. 551, 556-57 (6th Cir. 2006) (knee strikes to subdue active resistance not excessive); *see, e.g., James*, 2012 WL 1895952, at *8 (delivering knee strikes to body of actively resisting person and pinning his head and upper body to the ground to arrest him was objectively reasonable).

iv. Phantom Carotid Hold or Chokehold.

During discovery, Plaintiff questioned the officers regarding a phantom carotid or choke-hold. There is no evidence of any such hold when reviewing the different video angles. Neither officer was ever in a position to be behind Plaintiff. In fact, Officer Harris was on his right side for a significant portion of the struggle; during other portions of the struggle the officers' torsos were upright. There is no claim that Plaintiff ever lost consciousness. That the officers' hands may have been under the Plaintiff's head at various

different times for seconds, does not establish that there was any alleged chokehold or carotid hold.

v. Other Factors.

Ninth Circuit Model Civil Jury Instruction 9.27 directs consideration of all circumstances known to the officers, including the amount of time the officers had to determine the type and amount of force that reasonably appeared necessary, and any changing circumstances during that period; the availability of alternative methods to take the suspect into custody; the number of lives at risk and the parties' relative culpability—which party created the dangerous situation, and which party is more innocent; any effort made by the officers to temper or to limit the amount of force; and whether it was practical for the officers to give warning of the imminent use of force, and whether such warning was given. *Ninth Cir. Model Civ. Jury Instr. 9.27* (rev. Sept. 2025). Each favors Defendants.

First, this encounter elapsed over a very short period. Roughly 72 seconds elapsed between when Officer Harris exited his vehicle, and Plaintiff was placed into handcuffs. Officer Harris first asked Plaintiff to stop, did not know he could not hear, and the visual indications suggested that Plaintiff heard and recognized Harris' presence (phone usage, marked patrol vehicle, avoiding the vehicle). As he reached out to detain Plaintiff and place him into handcuffs, Officer Harris reasonably believed that Plaintiff was trying to swing at him. As they went to the ground, Plaintiff wrapped his leg around Officer Harris' leg, Harris struggled to free it, and then both officers deployed limited strikes to assist in placing Plaintiff in handcuffs. After trying to handcuff Plaintiff with his broken hand, Officer Harris utilized his Taser. (DSOF54). During those four cycles, Plaintiff's hand remained pinned beneath him, and it was only released as the fourth cycle started. (DSOF55-66). Although Plaintiff claims that he was only defensively resistant, this is not accurate as Plaintiff bit Officer Sue, which is an aggravated active resistance. (DSOF56). While the encounter only started with reasonable suspicion to detain, as it evolved, Plaintiff's actions increased the severity of the crime, severity of the threat, and the severity of the resistance.

Second, commands and warnings were given throughout; Plaintiff's position that he could not hear them was unknown to the officers. There is no dispute that Plaintiff was visually aware that he was interacting with uniformed police officers and that they were attempting to place him into handcuffs. There was not a barrier to Plaintiff stopping his resistance. Moreover, there was nothing compelling the Plaintiff to bite Officer Sue. As the court noted *Fernandez v. Cooper City*, in addressing a suspect's culpability relative to a struggle that occurred in a supermarket parking lot:

> The prone restraint, pressure on the upper torso (presumably from one of the officer's knees being pressed to [the decedent's] back, handcuffing, and struggle were all the result of [the decedent's] illegal, physical, and prolonged resistance. It was of course an unfortunate occurrence, but sympathy for a plaintiff does not transform law enforcement officials' objectively reasonable responses to a volatile situation into a constitutional violation.

207 F. Supp. 2d 1371, 1379-80 (S.D. Fla. 2002). Based upon the application of all factors, there was no constitutional violation.

**B. Harris And Sue Are Alternatively Entitled to Qualified Immunity on The Excessive-Force Claim**

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted). The qualified immunity inquiry is two-fold: (1) whether the facts as alleged show that the official's conduct violated a constitutional right; and (2) if so, whether the right violated was "clearly established." *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009). Courts have "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. To deny qualified immunity, "existing precedent must have placed the statutory or constitutional question beyond debate." *Shooter v. Arizona*, 4 F.4th 955, 961 (9th Cir. 2021). "It is not enough that a rule be suggested by then-existing precedent; the 'rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *City of Tahlequah v. Bond*, 142 S. Ct. 9, 12 (2021) (noting

that an unpublished decision and other factually dissimilar cases were insufficient and granting qualified immunity where officers shot a suspect who raised a hammer). In excessive force cases, "specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).

Plaintiff bears the burden of proving that Supreme Court case law, or at the bare minimum controlling circuit precedent, clearly establishes the law. *See Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) ("Neither [the plaintiff] nor the Court of Appeals identified any Supreme Court case that addresses facts like the ones at issue here…Even assuming that Circuit precedent can clearly establish the law for purposes of § 1983, *LaDonde* is materially distinguishable and thus does not govern the facts of this case."). The relevant question is not whether it is generally established that an officer may not use excessive force.

Most recently, in *Zorn v. Linton*, 607 U.S. 568, 572-573, 146 S. Ct. 926, 224 L.Ed.2d 400 (March 23, 2026), the Supreme Court entertained an extensive discussion of when the law can be clearly established. The Court's discussion of *Amnesty America* and how that case did not clearly establish the law is particularly important. The Court noted that while multiple different uses of force were addressed in *Amnesty America*, the case did not hold that any of those actions violated the Fourth Amendment, let alone all of them. Instead, it remanded for a jury trial because a jury **could** find that the force was or was not excessive. *Id.* The Court noted that *Amnesty's* statement that "officers who had engaged in a wide range of aggressive conduct may have used excessive force did not 'put [Zorn] on notice that his specific conduct was unlawful.'" *Id.* This discussion is critical and informs how cases that do not actually find a constitutional violation do not give clear guidance on the law.

It is anticipated that Plaintiff will focus on four cases to argue that the law was clearly established: *Rice v. Morehouse,* 989 F.3d 1112, 1125 (9th Cir. 2021), *Gravelet-Blondin v.*

*Shelton*, 728 F.3d 1086, 1095-96 (9th Cir. 2013), *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012), and *Blankenhorn v. City of Orange*, 485 F.3d 463, 478-479 (9th Cir. May 8, 2007) (addressing the gang tackle of a compliant suspect, accused of trespassing, who was not warned that force would be used). These cases, however, are factually dissimilar and do not clearly establish the law.

*Gravelet-Blondin* involved an innocent passive bystander, who was tased after he failed to immediately comply with an order to move away from a scene where his neighbor was attempting to commit suicide. *Id*. at 1089. The bystander heard his neighbor moaning in pain and went to investigate after hearing the commotion. *Id*. at 1090. Officers screamed at the bystander to back away, he took one to two steps backward, froze with fear, and was Tased without warning. *Id.* The bystander was originally thirty-seven feet away from officers and there was nothing in his demeanor, or distance, to establish that he posed an immediate threat. *Id*. The plaintiff made no threatening gestures before being shot with the Taser, which caused him to fall to the ground. *Id.* The Ninth Circuit found multiple questions of fact that made it impossible to determine if there was a Fourth Amendment violation, including whether there was probable cause to arrest the bystander for obstructing an officer, and whether he posed any threat simply for being within twenty-one feet from the officers when he was ultimately Tased. *Id*. at 1092. There was no finding that the force was unconstitutional. Instead, the court found viewing the facts in the light favorable to plaintiff: "a reasonable factfinder could conclude that Sgt. Shelton's use of force was unreasonable and excessive, in violation of the Fourth Amendment." *Id.*

Reliance on *Gravelet-Blondin* to clearly establish the law is impermissible under *Zorn's* rubric. That a jury could resolve the question in favor of the force being excessive does not establish that it was. Moreover, there is no factual similarity between *Gravelet-Blondin* and this case. Plaintiff was not an innocent neighbor who came out of his residence to check on his elderly neighbor and then froze with fear. Plaintiff visually identified the patrol vehicles, saw Officer Harris's vehicle and walked away from it, physically resisted

detention, engaged in actions reasonably interpreted as aggravated assault, wrapped his legs around Officer Harris to prevent handcuffing, and then ultimately bit Officer Sue.

Likewise, *Gravelet-Blondin's* general statement that "the right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established prior to 2008," does not clearly establish the law either. *Id.* at 1093. Like *Zorn's* discussion that "gratuitous force" was undefined, the application of non-trivial force and passive resistance is not defined with specificity either. Moreover, Plaintiff did not merely passively resist by standing still and freezing in place. If this were the case, the handcuffing would have been accomplished immediately.

The next case, *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012), is factually dissimilar as it involved an officer's indiscriminate deployment of a pepper ball into a crowd of party-goers, which hit the plaintiff in the eye causing serious injury requiring multiple surgeries. At the time the pepper ball was deployed, officers had been warned not to shoot indiscriminately, that pepper balls shot from over 30 feet away could not be accurately targeted, and that targeting the head could cause significant injury. *Id*. at 879. The officers testified to knowledge of these risks and apparent disregard of them. *Id*. *Nelson* determined that, at the time the pepper ball was deployed, there was no offense that had been committed, or at most, a misdemeanor trespass. *Id.* at 880. The officers did not believe that Nelson posed a threat and "the officers did not have a reasonable belief that Nelson or his friends engaged in violent behavior or that he or the students on the breezeway with him might do so absent the officers' intervention by force." *Id*.

*Nelson* next addressed the degree of governmental force necessary to attain compliance noting that "the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Id.* at 881. Officers "never attempted to place Nelson or his associates under arrest, so we need consider only whether the degree of force employed may be justified by a failure to comply with orders given by the officers." *Id. Nelson* then accepted that the police did not give any orders until after the pepper ball was fired so there could be "no failure to comply with orders, and

Nelson's actions cannot be viewed even as passive non-compliance." *Id*. Critically, the *Nelson* court also determined that "[a]lthough Nelson may not have acted as the officers wished, their unannounced preferences are not substitutes for police orders." Such that, "even if Nelson heard and was in non-compliance with the officers' orders to disperse, this single act of non-compliance, without any attempt to threaten the officers or place them at risk, would not rise to the level of active resistance." *Id*. at 882. The officer's general interest in clearing the apartment complex, without intent to make arrests, did not provide a legitimate governmental interest in the use of significant force at issue that caused serious injury. *Id*. at 883.

*Nelson* similarly denied qualified immunity because "a reasonable officer would have been on notice that both the firing of a projectile that risked causing serious harm, in the direction of non-threatening individuals who had committed at most minor misdemeanors, and the release of pepper spray in the area occupied by those individuals, would constitute unreasonable force in violation of the Fourth Amendment." *Id*. at 886. The non-threatening and non-resistant acts of Nelson, the likelihood of serious injury due to the indiscriminate use of the pepper ball, the serious injury Nelson sustained, and the lack of any commands make the facts of *Nelson* readily distinguishable from this case. Once again, Plaintiff was not a passive bystander.

In *Rice v. Morehouse*, 989 F.3d 1112, 1125 (9th Cir. 2021)—also distinguishable on the facts—plaintiff was stopped for failing to properly signal before changing lanes and failed to give officers his license. Officers pulled him out of the car, tripped him causing him to fall on his face, and pinned him to the ground as he was handcuffed, causing long-term physical injuries. *Id*. at *115. Rice provided a declaration establishing that he did not resist the officers as they pulled him out of the car, tried to handcuff him before he was thrown to the ground, or when they repeatedly struck and kneed him while he was on the ground. *Id*. at 1117. Rice alleged that he suffered extreme pain and long-term physical pain for which he received medical treatment. *Id*. at 1121. Rice was polite, surrounded by six officers, he did not yell, attempt to flee or harm the officers, and the court found that a

"reasonable jury could find that an officer standing in their shoes would have known that they were not facing an emergency situation." *Id.* at 1123. The crime was also not severe—a failure to signal for a full five seconds before changing lanes. *Id.*

*Rice* also found that there was no immediate threat to officer safety given that the only issue was a failure to give a driver license and more than a dozen officers were arriving at the scene. *Id.* There was also no evidence of any resistance and "Rice's refusals to exit his car are far closer to 'the purely passive protester who simply refuses to stand' than to the 'minor' or even 'truly active' forms of resistance that we have considered in other cases." *Id.* at 1124. Most critically, and as *Zorn* cautioned against, *Rice* did not find a constitutional violation, it merely analyzed each factor and found that "a reasonable jury could find" in the plaintiff's favor. *Id.*; *Gardner v. City of Phoenix*, 2026 U.S. Dist. LEXIS 185997, *20 (D. Ariz. Aug. 18, 2026) (distinguishing *Rice* and *Gravelet-Blondin* on factual differences applicable to this case).

In reaching its conclusions, the *Rice* court drew parallels to *Bryan v. McPherson*, 630 F.3d 805, 825 (9th Cir. 2010), where the suspect was stopped for a traffic stop, did not verbally threaten the officer, did not attempt to flee, and was Tased without warning such that he fell face-first into the ground fracturing his teeth and suffering facial contusions. *Rice* found that the plaintiff was forcibly thrown face-first into the pavement, while he posed no threat to the officers, that the traffic violation did not support the force, that refusal to get out of the car was not active resistance, and there was no attempt to try a less intrusive alternative. *Id.* at 1124; *Anne v. City of Anaheim*, 2025 U.S. Dist. LEXIS 10538 (C.D. Cal. Jan 21, 2025) (distinguishing *Rice* because the officer grabbed and began pulling the plaintiff into the hallway only after she actively resisted arrest and attempted to retreat into an apartment, a situation that posed a significant safety risk). Once again, *Rice* is readily distinguishable from this case. Officer Harris first reached out merely to detain Plaintiff and was met with resistance and the reasonable perception that Plaintiff was swinging at him. Plaintiff ended up going to the ground on his buttocks, the resistance continued, he wrapped his leg around Officer Harris's leg, and he then bit Officer Sue.

*Blankenhorn v. City of Orange*, 485 F.3d 464, 478-79 (9th Cir. 2007)—involving physical force, including fist strikes, on a criminal trespass suspect who was known to officers and had been compliant in the past—similarly does not clearly establish the right at issue in this case. As multiple cases recognize, *Blankenhorn* is easily distinguishable on its facts. *Hogan v. Cunningham*, 722 F.3d 725 (5th Cir. 2013) (finding *Blankenhorn* readily distinguishable as it involved a misdemeanor trespass, with a subject known to officers to be historically compliant, whereas the plaintiff at issue in *Hogan* started to close the door on officers and they had to decide immediately how to react). The holding of *Blankenhorn* should also be called into question based upon the Supreme Court's decision in *Cnty. of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017), rejecting the Ninth Circuit's "provocation rule" that an otherwise constitutional use of force may be rendered unconstitutional if the officer provoked the confrontation. *Id.* at 1547. *Blankenhorn's* analysis of qualified immunity is also contrary to United States Supreme Court law as the Ninth Circuit relied solely on *Graham* as the basis for finding the law "clearly established." Unlike in *Blankenhorn*, Plaintiff was not known to the officers. Officer Harris tried to first reach out to grab Plaintiff's arm, which in *Blankenhorn*, the officer simply gang tackled the suspect and struck him repeatedly without any warning. The level of threat, compliance, and resistance is completely different here.

In *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110 (9th Cir. 2017), the court overturned a jury verdict in plaintiff's favor and found qualified immunity, notwithstanding *Blankenhorn*, where the officers used force at a college party where hundreds of students were congregating, intoxicated, yelling, and reportedly throwing water balloons. One of the water-balloon-throwing potential suspects was grabbed by the arm, pulled toward the curb, swung toward the sidewalk, had his feet kicked out from under him causing a face-first fall to the pavement, and then officers piled on top of him, put a knee into his back and a foot on his head. *Id.* In analyzing the case law involving similar force, the court found "no such case" where an officer was acting under similar circumstances and distinguished

*Blankenhorn* on the basis that it did not involve "a challenging environment or an act of physical resistance or obstruction by the arrestee." *Id.* at 118.

Similarly, in *A.B v. Cnty. of San Diego*, No. 18-CV-1541-MMA-LL, 2020 U.S. Dist. LEXIS 182507 (S.D. Cal. Oct. 1, 2020)—involving a physically resistive non-compliant suspect who was Tased and struck in a Hobby Lobby parking lot—the court distinguished *Blankenhorn* because *Blankenhorn* did not involve a physically resistive suspect. "In this case, Deputy Garza engaged Kristopher verbally, attempted to handcuff him, and only after he was unsuccessful in doing so did he resort to pushing Kristopher down into a seated position on the walkway outside the store's entrance." *Id.* at *37. The A.B. court also found that four hammer-fist strikes to the head, hands, and shoulders, and six strikes with a sap, did not violate clearly established law as the strikes at issue in *A.B.* occurred after the suspect actively resisted and continued to resist detainment. *Id*. at *52-53.

The Ninth Court also distinguished the holdings of *Rice* and *Blankenhorn* in *Andrich v. Kostas,* 2023 U.S. App. LEXIS 25002 (9th Cir. Sept. 21, 2023), for reasons that apply equally to this case. *Andrich* affirmed the District Court's granting of summary judgment when officers tried to handcuff a trespasser, who forcibly resisted them, and the officers then took him to the ground, delivered kicks and punches, and were unable to handcuff him. *Id*. at *2. The officers then twice tried to deploy Tasers, were unable to do so, and then Andrich walked away with one handcuff still dangling. *Id.* When he wielded the handcuff like a weapon, he was shot. *Id. Andrich* distinguished *Blankenhorn*, finding it dissimilar, "as it concerned officers who tackled a cooperating suspect without first attempting to handcuff him." *Id*. at *3. *Andrich* distinguished *Rice* because "the suspect did not resist arrest." *Id.*

Contrary to the cases that Plaintiff will likely rely upon, *Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123 (9th Cir. Oct. 20, 2017), supports qualified immunity. In *Jones,* officers stopped plaintiff for a routine traffic stop and ordered him out for a pat down. *Id.* at 1127. Jones initially complied, but then turned toward the officer, who drew his weapon and Jones ran away. *Id.* A Taser was deployed, causing Jones' body to lock up, he

fell to the ground, and his hands were underneath his body. *Id.* Jones was held prone, with a knee in his back, while the officer repeatedly pulled the trigger against Jones' thigh. *Id.* More officers arrived and they also simultaneously tased Jones, who went limp and died. *Id.* In addressing the initial Taser application and takedown for running from the officer, the Ninth Circuit held that:

> …the officers' use of force began appropriately enough: Despite Jones' large size and the fact that he had run away from a traffic stop, he had neither threatened Hatten nor committed a serious offence, and he didn't appear to have a weapon. Based on these facts, Hatten believed that something less than deadly force was justified, so he used his taser to subdue Jones. This decision was consistent with our case law, as we have held that the use of tasers can be intermediate force.

*Id.* at 1131. From there, however, *Jones* determined that leaving the decedent prone ultimately causing his death, while surrounded and not resisting, did not justify repeated and continuous Taser applications. *Id.* at *1131.

In *Oneal v. Roberts*, 2023 U.S. Dist. LEXIS 53036 (D. Ariz. Feb. 22, 2023), this District relied upon *Jones* to address a Taser deployment against a suspect who was on drugs, walking in the street away from officers, was commanded to get out of the street, and was non-compliant. *Id.* at *8. The plaintiff was Tased, causing neuromuscular incapacitation and he fell face-first to the ground. *Id.* The court found that the law was not clearly established, relying on *Jones*: "[l]ike Jones, Plaintiff is large, had not committed a serious offense, and did not appear to have a weapon. Although Jones ran away from the traffic stop, Plaintiff's attempts to walk away from the officers and his unwillingness to obey their repeated orders are similar to Jones' attempts to flee, and it is undisputed that Plaintiff was in the middle of the street at the time police made contact with him, creating a possibly dangerous traffic situation." *Id.* at *12. On appeal, the Ninth Circuit affirmed the District Court's reasoning and reliance on *Jones*. *See Oneal v. Roberts*, 2025 U.S. App. LEXIS 3002 (9th Cir. Feb. 10, 2025) (unpublished).

More recently, in *Spencer v. Pew,* 117 F.4th 1130 (9th Cir. Sept. 16, 2024), the Ninth Circuit affirmed a grant of qualified immunity on nearly all force used in an incident, except for kneeling on the upper back and neck of a suspect after he was handcuffed and fully

under control. While decided after this incident, the Court's analysis of the relevant facts and case law is relevant and applicable. *Spencer* involved a traffic stop where the passenger refused to give his identity and the responding officer moved to arrest him for providing a false identity. *Id.* at 1134. When an officer moved to handcuff him, he "pushed [the officer] with his left shoulder hitting him in the chest." *Id*. While one officer held his wrist, the other punched him in the face, knocking him to the ground. *Id*. For three-and-a half minutes the officer wrestled with Plaintiff and could not put him in handcuffs. *Id*. A taser was deployed at least four times, including once in probe mode to the neck. *Id*. The Taser was also deployed three times in drive stun. *Id*. "During this time, Spencer was also repeatedly punched and kicked in the face by the officers." *Id*. Spencer was given multiple commands and claimed that his arms were locked up from the struggle. *Id*. Spencer denied throwing a punch, kick, or any type of strike towards an officer; he screamed that he had a pacemaker. *Id*. While Spencer was on the ground, one of the officers placed Spencer's "head between his knees, and, while swearing, picked up Spencer's head and slammed it into the ground several times. Pew tasered Spencer in the neck for approximately 12 seconds, before beginning to apply pressure to Spencer's carotid artery using what he called in his police report the 'carotid control technique.'" *Id.* at 1135. Spencer was handcuffed using two sets of handcuffs, but force was used to continue to pin him to the ground. *Id*. at 1135. Spencer broke his nose, reportedly had fractures in his back, had multiple cuts and abrasions all over his face and was bleeding profusely during the interaction.

In analyzing the force, the Court noted that once Spencer pushed Officer Rozema with his shoulder, "he had committed the offense of aggravated assault…This was a sufficiently serious offense to warrant the use of potentially significant force to ensure that Spencer submitted to arrest." *Id.* at 1138-39. The court noted that, after the initial assault, Spencer did not engage in any specific assault directed towards officers. *Id.* at 1139. The Court rejected Spencer's claims that he did not subjectively intend to resist and was doing so only because of the effect of the Taser and that he was trying to block punches, but the Court held that "Spencer's subjective intentions are not relevant except to the extent that

they were communicated to the officers" finding that "we cannot say that every reasonable officer, considering the objective circumstances concerning the nature and length of Spencer's non-compliance, would have taken his statements at face value." *Id.* at 1140. *See Winterrowd v. Nelson*, 480 F.3d 1181, 1184 (9th Cir. 2007) (noting that an officer need not "unduly credit[]" a suspect's claim that he is "physically unable to comply with a request."). The Court found that the video corroborated the fact that the officers had great difficulty in getting Spencer handcuffed. *Id.* at 1140. Given all these facts, the court found that "this is not an 'obvious case' where 'a body of relevant case law' is not needed." 117 F.4th at 1140. The Court further noted that "[Spencer's] objective actions made it very difficult for the officers to handcuff him, resulting in an extended struggle and multiple uses of various types of force (a stomach punch, head strikes, and taser shots) that each could be thought to be likely to reduce Spencer's non-compliance with being handcuffed." *Id.*

*Spencer* also analyzed *Jones v. Las Vegas Metropolitan Police Department*, 873 F.3d 1123 (9th Cir. 2017), *Mattos v. Aragano*, 661 F.3d 433 (9th Cir. 2011), and *Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007), finding that each of these cases were distinguishable due to the level of resistance and conduct by Spencer. The Court expressly distinguished *Blankenhorn* because the decision rested upon the fact that Blankenhorn "'never pinned his arms underneath his body' as officers struck him to attempt to free his hands." *Id.* at 1142. This meant that "Blankenhorn's arms were accessible to the officers, and the punches were simply unnecessary and excessive." *Id.* The Court found that, unlike in *Blankenhorn*, "the undisputed evidence shows that, at the time of the various strikes to Spencer, his arms were not comparably available to the officers for handcuffing." *Id.* Unlike in these cases, Spencer's "objective behavior involved protracted and substantial non-compliance" such that qualified immunity applied to all force up until the point of handcuffing.[2]

---

[2] *Spencer's* discussion of the force used after handcuffing does not apply to this case as it is undisputed in this case that there was no force used after handcuffing.

Here, as articulated in *A.B.*, *Shafer*, *Jones, Oneal*, and *Spencer,* D.S.'s apparent injury and identification of Plaintiff as the suspect, Plaintiff's initial strike and additional attempted strikes, his ongoing physical resistance, his refusal to provide his arms, and Sue's bite injury distinguish this case from decisions involving nonthreatening, nonresistant subjects or minor offenses. No controlling authority clearly establishes that officers violated the Fourth Amendment by using the force at issue to control an individual who swung at an officer, resisted ground control, kept an arm beneath his body, locked his legs around one officer, and then perpetrated a bite. Officers Harris and Sue are thus entitled to qualified immunity.

### C. Defendants Are Entitled to Summary Judgment on the False-Arrest Claims

#### *1. The False Arrest Claims Fail as there was Probable Cause to Arrest, Which Was Conclusively Determined at the Preliminary Hearing*

Issue preclusion precludes Plaintiff from arguing a lack of probable cause because he had a full opportunity to litigate the matter in the underlying criminal case. *See Evans v. Bredehoft*, 2019 U.S. Dist. LEXIS 186259 (D. Ariz. Oct. 24, 2019) (applying *res judicata* and collateral estoppel to plaintiff's civil rights claim based upon issues raised and decided in his criminal case). "As long as a litigant had a full and fair opportunity to litigate the issue, collateral estoppel…based upon state-court criminal proceedings applies to subsequent civil litigation under [Section] 1983." *Scafidi v. Las Vegas Metro. Police Dep't*, 966 F.3d 960 (9th Cir. 2020). When asserted defensively, collateral estoppel applies when (1) the issue is the same in both proceedings; (2) the issue was actually litigated and determined in a valid judgment; (3) the opposing party had a full and fair opportunity to litigate the issue and did so; and (4) the issue was essential. *Stuart v. City of Scottsdale*, 2024 U.S. Dist. LEXIS 54742, * 37 (D. Ariz. Mar. 27, 2024). An issue is "actually litigated" when it is "properly raised by the pleadings or otherwise, and is submitted for determination, and is determined." *Id.* A "final judgment" can be "any prior adjudication of an issue in another action that is determined to be 'sufficiently firm' to be accorded conclusive effect.'" *Id.* at *37-38.

The issue of probable cause to arrest for resisting arrest and two counts of aggravated assault (physical strike toward Officer Harris and bite for Officer Sue), was decided following a full hearing where Plaintiff's counsel had the opportunity to cross-examine both witnesses and present evidence. *See Guenther v. Holmgreen*, 738 F.2d 879, 884 (7th Cir. 1984) (false arrest claim was barred by issue preclusion because the sufficiency and integrity of evidence supporting probable cause was litigated during the plaintiff's preliminary hearing as the state court's determination necessarily depended on its finding that the evidence supported the officer's testimony and the officer acted in good faith); *Haupt v. Dillard*, 1994 U.S. App. LEXIS 3290 (9th Cir. Feb. 25, 1994) (citing *Guenther*, finding collateral estoppel under Nevada law, by holding that the issue determined at the preliminary hearing was identical to the issue of whether there was probable cause to arrest; both involved a determination that the evidence available and known to the officers at the time of the arrest supported a reasonable belief that the suspect committed the offenses charged).[3] The state court allowed presentation of the video evidence, testimony by the officers, and cross-examination. The issue of probable cause was fully litigated by Plaintiff's criminal defense attorney, in a preliminary hearing, and collateral estoppel bars re-litigation of this issue.

Even in the absence of the preliminary hearing finding, probable cause existed for the arrest. Probable cause provides a complete defense to the Fourth Amendment false arrest claims. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019). It requires only "a fair probability, given the totality of the evidence," not conclusive proof. *Garcia v. County of Merced*, 639 F.3d 1206, 1209 (9th Cir. 2011) (internal quotation marks omitted). Probable cause for arrest is not equivalent to a full trial on the merits. Probable cause "is not a high bar: It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Kaley v. United States*, 571 U.S. 320, 338 (2014). "Suspicious behavior,"

[3] The elements of issue preclusion in Nevada, which were considered in *Haupt*, are the same as in Arizona: (1) the issue was "actually litigated" and "necessarily determined" in the prior proceeding, and (2) the parties in the two proceedings were the same. In *Stuart*, 2024 U.S. Dist. LEXIS 54742, *60, the court cited to *Haupt* in analyzing collateral estoppel.

including "nervous, evasive behavior is a pertinent factor" in assessing probable cause. *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). Indeed, probable cause can be based upon evidence that may later be inadmissible at trial, such as hearsay. *See Trujillo v. Rio Arriba Cnty. ex. rel. Rio Arriba Cnty. Sheriff's Department*, 319 F.R.D. 571 (D.N.M. Dec. 19, 2016) (allowing HGN test to be utilized to determine probable cause without meeting *Daubert*'s reliability standard). Likewise, a claim of "inadequate investigation" is insufficient to defeat probable cause. *See Yancey v. Carrol County, Ky.*, 876 F.2d 138, 1245 (6th Cir. 1989); *Gavitt v. Ionia County*, Case No. 14-12164, 2014 U.S. Dist. LEXIS 172552 (E.D. MI. Dec. 15, 2014) (dismissing claim that fire investigators conducted an incomplete and inadequate fire investigation, concluding that the fire was incendiary and continuing the investigation with that conclusion in mind).

The threshold "determination of whether the facts alleged could support a reasonable belief in the existence of probable cause…is [] a question of law to be determined by the court." *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993). Probable cause is not limited to the specific officer's "subjective reason for making the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 154 (2004). Probable cause to arrest can be based upon any criminal offense, regardless of the stated reason for the arrest or charged offenses. *Edgerly v. City & Cnty. of San Francisco*, 599 F.3d 946, 954 (9th Cir. 2010) ("probable cause supports an arrest so long as the arresting officers had probable cause to arrest the suspect for any criminal offense, regardless of their stated reason for the arrest.").

Pursuant to A.R.S. § 13-1204, a person commits an aggravated assault when committing an assault having reason to know that the victim is a law enforcement officer. A simple assault, pursuant to A.R.S. § 13-1203, by (1) intentionally, knowingly or recklessly causing any physical injury to another person; or (2) intentionally placing another person in reasonable apprehension of imminent physical injury; or (3) knowingly touching another person with the intent to injury, insult or provoke such a person. A person commits resisting arrest by intentionally preventing or attempting to prevent a person reasonably known to be a peace officer from effecting an arrest by (1) using or threatening to use

physical force; (2) using any other means of creating a substantial risk of causing physical injury; or (3) passive resistance, which is defined as a nonviolent physical act that is intended to impede, hinder, or delay effecting the arrest. *See* A.R.S. § 13-2508.

First, Plaintiff was arrested by Officers Sue and Harris, not Officer Acosta. At minimum, Plaintiff bit Officer Sue, causing a visible injury and blood on his hand, which is both assault and resisting arrest. Plaintiff's subjective state of mind as to the reason for the bite is not relevant to whether there was probable cause to arrest for this action. In addition, Officer Harris reasonably perceived that Plaintiff intended to strike him, which constitutes a separate aggravated assault and also resisting arrest. The arrest had nothing to do with the mistake concerning the phone. The Form IV did not include any proposed charges for the phone either. Even if there was a mistake regarding the phone, relating to a charge that was later added by the prosecution and not a basis for the arrest, that does not undermine or change the probable cause to arrest for the more serious felonies.[4] There need only be probable cause for one crime, not all crimes. The addition or subtraction of the phone does not change the arrest, or the subsequent booking.

### *2. The Defendants Are Entitled to Qualified Immunity*

The Defendants are also entitled to qualified immunity. The Ninth Circuit recently addressed the application of qualified immunity in the context of a probable cause to arrest in *Hill v. City of Fountain Valley*, where officers made arrests related to a believed kidnapping that turned out to be an anniversary surprise:

> We have held that qualified immunity applies when it was objectively reasonable for an officer to believe he or she had probable cause to make the arrest. *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 (9th Cir. 2011). 'Framing the reasonableness question somewhat differently, the question in determining whether qualified immunity applies is whether all reasonable officers would agree that there was no probable cause in this instance.' *Id.* at 1078 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)). Here, qualified immunity applies because not all reasonable

[4] The way Plaintiff conceptualizes the phone claim is more akin to a wrongful incarceration claim, which is not pled in the Complaint. The phone is not causally connected to Officers Harris and Sue's arrest of Plaintiff as there is no evidence that they even knew about the phone or that it influenced their decision to place Plaintiff into handcuffs.

> police officers would believe that they lacked probable cause to make the arrest, especially given the urgency and unique facts here.

70 F.4th 507, 516 (9th Cir. June 1, 2023); *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1443 (9th Cir. 1991) (qualified immunity does not require that probable cause exists and it applies even if officers were mistaken as long as the mistake was reasonable). The court noted that "we are wary of second-guessing the split-second 'judgments made by law enforcement officers in the heat of their battle against crime' from the certainty and comfort of our chambers." *Id.* at 517; *Hill v. California*, 401 U.S. 797, 804-05, 91 S. Ct. 1106, 28 L. Ed. 2d 484 (1971) (finding that officers acted reasonably based on the totality of the circumstances, including a good-faith, but ultimately mistaken, belief that they were arresting the correct suspect). Here, not all officers would agree that there was no probable cause in this instance. This is particularly true where a judicial officer, hearing full testimony over an extended preliminary hearing with cross-examination (verses the officers' 72 seconds to assess the situation), determined that there was probable cause to hold Plaintiff over for trial for resisting arrest and two counts of aggravated assault.

### D. The Assault-And-Battery Claim Fails Because the Force Was Legally Justified

Arizona law justifies an officer's use of physical force when a reasonable person would believe it immediately necessary to effect a lawful arrest or detention, the officer makes known the purpose of the detention or reasonably believes it is otherwise known or cannot reasonably be made known, and a reasonable person would believe the detention lawful. A.R.S. § 13-409.

For the same reasons that the record establishes reasonable suspicion, probable cause, and objectively reasonable force under the Fourth Amendment, it establishes statutory justification under A.R.S. § 13-409. Officers Harris and Sue used force while investigating a reported assault, addressing Plaintiff's assaultive conduct and resistance, and obtaining his arms for handcuffing. The force ceased once Plaintiff was cuffed.

A statutory presumption applies as well. When a plaintiff is harmed while committing a felony, a peace officer who uses force to protect himself or another or to effect

an arrest "is presumed to be acting reasonably." A.R.S. § 12-716(A)(1), (C)(2); *See also Ryan*, 425 P.3d at 237 ("[S]tatutory presumptions are triggered when a law enforcement officer intentionally uses physical force to arrest or capture a suspect and the suspect is injured. The officer is 'presumed to [have been] acting reasonably' in using physical force."). A court need only make such a finding by a preponderance of the evidence. A.R.S. § 12-716(A). *See also Valdez v. City of Phoenix*, No. CV-18-0921-PHX-DGC, 2019 U.S. Dist. LEXIS 182312 at *5-7 (D. Ariz. Oct. 21, 2019). The presumption applies here if Plaintiff committed an aggravated assault due to punching or attempting to punch Officer Harris, resisted arrest, and/or aggravated assault due to biting Officer Sue.

Officers Harris and Sue are entitled to summary judgment on Count One.

## IV. CONCLUSION

Defendants respectfully request that the Court enter summary judgment in favor of Officers Harris, Sue, and Acosta on all remaining claims.

DATED this 20th day of November, 2026.

WIENEKE LAW GROUP, PLC

By: <u>*/s/ Christina Retts*</u>
Kathleen L. Wieneke
Christina Retts
1225 West Washington Street, Suite 313
Tempe, Arizona 85288
*Attorneys for Defendants City of Phoenix, Benjamin Harris, Kyle Sue, and Jorge Acosta*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2026, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Jesse M. Showalter
Lauren E. Channell
ROBBINS CURTIN MILLEA & SHOWALTER, LLC
301 E. Bethany Home Road
Suite B-100
Phoenix, Arizona 85012
*Attorneys for Plaintiff*

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

By: */s/ Lauren Rasmussen*